**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

IN RE:

DESIGNLINE CORPORATION,                 CASE NO. 13-31943
                                        CHAPTER 11
    DEBTOR.

IN RE:

DESIGNLINE USA, LLC,                    CASE NO. 13-31944
                                        CHAPTER 11
    DEBTOR.                             (JOINTLY ADMINISTERED)

**MOTION FOR ORDER
(I) APPROVING AUCTION AND BIDDING PROCEDURES IN CONNECTION WITH
THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS,
(II) AUTHORIZING, BUT NOT REQUIRING, ENTRY INTO A STALKING HORSE
AGREEMENT AND APPROVING STALKING HORSE PROTECTIONS, (III)
APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV)
SCHEDULING AUCTION AND SALE APPROVAL HEARING, AND (V)
APPROVING THE FORM AND MANNER OF THE SALE NOTICE**

Come now the Debtors, through their Chief Restructuring Officer, and hereby move this Court for entry of an order (i) approving certain auction and bidding procedures in connection with the sale of substantially all of the Debtors' assets, (ii) authorizing, but not requiring, the Debtors to enter into a stalking horse purchase agreement and approving certain stalking horse protections, (iii) approving certain procedures related to the assumption and assignment of executory contracts and unexpired leases, (iv) scheduling an auction and sale approval hearing, and (v) approving the form and manner of sale notice (the "Motion") and request a hearing on this Motion on October 1, 2013 at 9:30 a.m. at the United States Bankruptcy Court, Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina. In support of the Motion, the Debtors respectfully submit as follows:

## INTRODUCTION

1.      On August 15, 2013 (the "Petition Date"), Designline Corporation and DesignLine, USA (collectively, the "Debtors") filed chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware.  The Debtors' cases were transferred to the United States Bankruptcy Court by order dated September 4, 2013.

2.      Katie Goodman of GGG Partners is acting as the chief restructuring officer of the Debtors ("CRO").

3.      An Official Committee of Unsecured Creditors (the "Committee") was appointed on August 27, 2013.

4.      The Debtors are Delaware Corporations with their principal place of business in Charlotte, North Carolina.

5.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §1334.  Venue of this proceeding and this Motion are proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought in the Motion are Sections 105(a), 363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code")[1] the Bankruptcy Code and Rules 2002, 6004, 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

6.      The Debtors are a leading designer and manufacturer of electric, electric range extended, diesel and alternative fuel transit buses, and served the private transportation industry and public transportation authorities in the United States, Canada, the Middle East and Asia.

7.      The Debtors were founded in New Zealand 25-years ago and began development of hybrid buses in the early 1990s.  In August 2006, a small group of U.S. investors acquired the assets of the New Zealand predecessor and began to leverage the company's core technology into

---

[1] Further references to 11 U.S.C. §§ 101 et seq. will be by section number only.

market share.  Prior to 2006, the average annual revenue for the New Zealand predecessor was between $4 and 5 million USD and was based primarily on diesel bus sales in New Zealand. Following the acquisition, the new management team instituted a growth strategy that substantially increased annual revenues to over $30 million USD in 2009.  Nonetheless, the Debtors incurred losses from operations of $25.8 million USD 2010 and $24.1 million USD in 2011.

8.      Because the Debtors have been limited by capital constraints they have not been able to scale their operations to attain profitability, notwithstanding the quality of technology and products.  In the fall of 2009, the Debtors initiated a reverse merger initial public offering through a national investment bank in order to raise $50 million USD of equity capital, but the transaction failed to close.  During the period from January 2010 until November 2011, the Debtors closed a $5 million USD Preferred Stock financing (in April 2010) and a $6 million USD secured debt facility (in November 2010), but this was not enough capital to enable it to expand operations and become profitable.  In November 2011, the Debtors (i) signed a significant contract with New Jersey Transit ("NJ Transit") to produce and deliver seventy-six (76) cruiser buses fueled by compressed natural gas ("CNG") and (ii) closed a senior credit facility with institutional investors that provided approximately $28.8 million USD of new capital (subsequently increased to approximately $33 million USD through a second closing).  In order to produce the NJ Transit buses, however, the Debtors were required to make substantial capital investments to build and test a prototype bus, fit up its facilities, and hire and train a substantial work force (approximately 250 employees) in order to execute the NJ Transit contract.  By May 2012, the Debtors had expended all of $33 million USD of capital raised pursuant to the November 2011 senior credit facility.  During the period from May 2012 through

December 31, 2012, (i) the Debtors converted approximately $48.9 million USD of principal and interest under the November 2011 senior credit facility into preferred equity and (ii) raised approximately $14 million USD of senior preferred equity from existing investors to fund operations. During the period from January 1, 2013 through August 15, 2013, the Debtors raised approximately $19.6 million USD of senior debt from existing investors to fund operations and build buses under the NJ Transit contract.

9.      The Debtors' manufacturing facility is leased and consists of approximately 100,000 square feet. Operating on a single shift, the U.S. plant can produce in excess of 325 vehicles per year. With additional shifts and additional capital expenditures, the plant has a maximum capacity of over 600 buses per year.

10.     The mass transit industry is a historically stable, multi-billion dollar market. For a number of reasons ranging from environmental concerns to the promise of lower overall operating costs, demand for electric and hybrid vehicles is escalating. The Debtors, over the past 7 years have committed substantial resources to: (a) accelerate final development and testing of its fourth generation hybrid product (the EcoSaver IV) and its first generation electric product (the EcoSmart I); (b) penetrated new geographic markets in Australia, United States and the Middle East; and (c) significantly expanded its manufacturing capabilities.

11.     The Debtors' hybrid and electric propulsion systems are designed to excel in the high-density, stop-and-go, urban transit route profile that typifies mass transportation. These systems use proven technology in innovative and proprietary ways to provide significant environmental and cost-savings advantages over traditional buses. All of the Debtors' buses also benefit from high strength construction methods that produce lightweight and structurally sound buses.

4

12.     The Debtors use a combination of trade secrets and patents to protect its proprietary systems.  As of the date hereof, the Debtors have 14 patents, 7 registered trademarks and is in the process of obtaining 5 additional trademark registrations to protect the branding of its trade names.

13.     Prior to the Petition Date, the Debtors entered into various financing arrangements.  There is a First Lien Senior Secured Facility in the amount of $8,703,846, and Second Lien Senior Secured Facility in the amount of $19,452,036.

14.     As part of the Second Lien Senior Secured Facility, the Debtors and the holders of the First Lien Senior Secured Facility entered into certain Specified Vehicle Lien Loan Agreements pursuant to which the Debtors granted, with the assent of the senior debt holders, a $3 million first priority security interest in individual vehicles and a second priority security interest in the collateral securing the First Lien Senior Secured Facility.

15.     The Debtor had, on the Petition Date, a substantial backlog of buses to be delivered under its contract with the State of New Jersey and is owed substantial amounts under that contract.  Throughout 2012 and 2013, however, the Debtors were operating on a budget dependent on continued borrowing to sustain ongoing operations.

16.     In July of this year, the Debtors entered into a letter of intent with a prospective investor that would have provided necessary cash flow.  On July 27, 2013, the investor unexpectedly terminated its interest under the letter of intent.  The Debtor was unsuccessful in locating additional financing and by subsequent notice terminated its existing staff and factory workers at the beginning of August, 2013.

17.     Presently, with the exception of approximately 12 employees, the Debtors have terminated the entire workforce and has, for the most part, ceased active production operations.

18.     By Order dated September 13, 2013, the Debtor was authorized to borrow $500,000 from Cyrus Opportunities Master Fund II Ltd., Cyrus Select Opportunities Master Fund, Ltd., and Crescent I, LP (collectively, the "**Cyrus Entities**") as interim debtor in possession financing (the "Interim DIP Loan").  The Interim DIP Loan is secured by a lien on all of the DIP Collateral (as defined in the Interim DIP Order) pursuant to sections 364(c) and (d) of the Bankruptcy Code, which lien is senior to the Primed Liens but which shall be junior to (a) a Carve-Out, and (b) the First Priority Specified Vehicle Lien in the principal amount of $3 million.  The Debtors are seeking a Final DIP Order authorizing a total loan of $1.5 million by the Cyrus Entities to fund the Debtors' expenses and costs of the chapter 11 through November 30, 2013.  A hearing is scheduled on October 1, 2013 for consideration of the Final DIP Order.

19.     The CRO has prepared a pro forma budget (the "Budget") which shows the Debtors' use of the financing to fund expenses through November 30, 2013 (See **Exhibit A**).  As evidenced by the Budget the CRO forecasts that the $1.5 million in funding may not be sufficient to take the Debtors through November 30, 2013; thus time is of the essence to determine the value of the Assets.  For these reasons it is imperative that the Assets be sold immediately.  A very quick sale will capture whatever value remains which will benefit the estate and provide the remaining employees who hold valuable knowledge regarding the Debtors' intellectual property and operations an opportunity to remain employed.

20.     The Debtors have or will be filing a motion seeking authorization under § 363 of the Bankruptcy Code (the "Sale Motion") to sell substantially all of the assets of the Debtor either: (a) pursuant to the terms of an asset purchase agreement to be entered into with a to-be-identified Stalking Horse, which agreement is subject to over bidding at the Auction; or (b) at the Auction.

21.     By this Motion, the Debtors requests entry of an order:

(i)     approving procedures (the "Bidding Procedures"), for (a) submitting
bids for the purchase of all or substantially all of the Assets (as defined
below), and (b) conducting an auction for the Assets (the "Auction"),
in the event that the Debtors receive two or more Qualified Bids for the
Debtors' Assets;

(ii)    authorizing, but not requiring, the Debtors, as provided herein, to (a)
enter into a "stalking horse" agreement (a "Stalking Horse
Agreement"), with a bidder (the "Stalking Horse Bidder") for the purpose
of establishing a minimum acceptable bid for the Debtors' Assets
(the "Stalking Horse Bid"), and (b) provide any Stalking Horse
Bidder with (i) a break-up fee (the "Break-Up Fee") of the greater of
$30,000 or 3% of the guaranteed cash purchase price of the successful
bid, and (ii) expense reimbursement (the "Expense Reimbursement")
of up to $35,000, or as otherwise approved by the Court;

(iii)   approving procedures (the "Assumption and Assignment Procedures")
for the assumption and assignment of certain executory contracts
(the "Contracts") and unexpired leases (the "Leases") in connection
with the sale of the Assets and resolution of any objections thereto;

(iv)    scheduling (a) a deadline to submit bids for the Assets of October 25,
2013 at 12:00 noon prevailing eastern time, (b) the date of the Auction
for October 28, 2013 at 10:00 a.m., (c) the date of the hearing to consider
approval of the proposed sale of the Assets (the "Sale Approval
Hearing") for October 29, 2013 at 9:30 a.m., and (d) a deadline
to consummate the sale of the Assets of November 8, 2013.

(v)     approving the form and manner of notice of the deadline to submit bids
for the Debtors' Assets, the date and time of the Auction and the date
and time of the Sale Approval Hearing; and

(vi)    granting certain related relief.

## Assets to be Sold

1.      The Debtors will seek to sell substantially all of the Debtors' assets,
including, without limitation, all equipment, machinery, inventory, supplies, commercial
customer data and information, real property, software, intellectual property, books, records,
accounts, chattel paper and electronic chattel paper, documents of title, certain leases, goods,
and investment property (such assets, the "Assets") as set forth in the Sale Motion.  Except as

7

otherwise provided in definitive documentation with respect to any sale of the Assets and except as set forth in the Sale Order, all of the Debtors' rights, title and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances, rights, remedies, restrictions, pledges, interests, liabilities, charges, options and contractual commitments of any kind or nature whatsoever, whether arising before or after the Petition Date, whether at law or in equity, in accordance with section 363 of the Bankruptcy Code

## **Stalking Horse Bid**

2.      The Debtors may enter into a Stalking Horse Agreement for the purpose of establishing a Stalking Horse Bid.

3.      In the event that the Debtors enter into a Stalking Horse Agreement, the Debtors shall (i) promptly file a notice with the Court that includes a copy of any such agreement (which may be part of the Sale Motion or may be separate) and (ii) provide a copy of such agreement to any Potential Bidder upon request.  The Debtors believe that their entry into a Stalking Horse Agreement with a Stalking Horse Bidder will provide substantial benefit to the estate and will help maximize value in any sale of the Debtors' Assets.  Specifically, a Stalking Horse Bidder will establish a minimum bid for the Auction and a complete template of offer terms with respect to the Assets in the form of the proposed asset purchase agreement.

4.      The Debtors may in their discretion, or as otherwise ordered by this Court, provide the Stalking Horse Bidder with a Break-Up Fee as set forth above and an Expense Reimbursement of up to $35,000, for its actual and reasonable documented expenses (including professional fees and expenses associated with the transaction and/or financing of the transaction) incurred in the connection with the proposed purchase of the Assets, to be paid out of the purchase price proposed in the Stalking Horse Bid, if approved pursuant to this Motion by the Court.

8

Payment of the Break-Up Fee and the Expense Reimbursement is contingent upon a determination that the Stalking Horse Bidder is not in default, has not previously terminated its bid, is not determined to be the Successful Bidder, is not an "insider" of the Debtors, as such term is defined in section 101(31) of the Bankruptcy Code, and the sale of the Assets has been consummated to someone other than the Stalking Horse Bidder.  The Stalking Horse Bidder shall also be entitled to payment of the Expense Reimbursement if the Stalking Horse Agreement is the Successful Bid and the transaction contemplated by the Stalking Horse Agreement does not close for any reason other than a material breach by the Stalking Horse Bidder or the exercise by the Stalking Horse of any termination rights under the Stalking Horse Agreement (except if such exercise is as a result of the Debtors' material breach of the Stalking Horse Agreement).

<u>**The Bidding and Auction Procedures**</u>

5.      To obtain the highest and otherwise best bid for the Debtors' Assets, the Debtors intend to implement the Bidding Procedures set forth herein.  A Notice of the Bidding Procedures will be filed before the hearing on this Motion.  The Bidding Procedures set forth, among other things, the availability of due diligence for Potential Bidders, the deadline and requirements for submitting a Qualified Bid, the procedures for conducting the Auction, and the criteria for determining the highest and otherwise best Qualified Bid for the Assets (the "<u>Successful Bid</u>").

6.      The following summary highlights the material terms of the Bidding Procedures. The Bidding Procedures will be provided in detail and filed with the Bankruptcy Court no later

than September 30, 2013.[2]  Interested parties should review the detailed Bidding Procedures.

### A.    Bid Deadline

7.    Any entity wishing to participate in the Auction (a "Potential Bidder") must submit a Qualified Bid (as defined below) **in writing by overnight mail** to (i) Katie Goodman, GGG Partners, 5883 Glenridge Drive, Suite 160, Atlanta, Georgia 30328,  and copies must be provided (without the Good Faith Deposit) to (ii) Terri L. Gardner, counsel for the Debtors, at Nelson Mullins Riley & Scarborough, LLC, 4140 Parklake Avenue, Glenlake One, Suite 200, Raleigh, NC 27612; and (iii)  Kay Kress, counsel for the Cyrus Entities, at Pepper Hamilton, LLP, Suite 1800,  4000 Town Center, Southfield, MI 48075-1505 **so as to be** **actually received** on or before October 23, 2013, at 12:00 noon (**Prevailing Eastern** **Time)** (the "Bid Deadline"), which deadline may be extended by the Debtors. Unless the Bid Deadline is extended, no bids submitted after the Bid Deadline shall be considered by the Debtors.

### B.    Bid Requirements

8.    Only bids for the Assets that constitute "Qualified Bids" will be considered by the Debtors.  A "Qualified Bid" is an offer to purchase the Assets that:

> (i)    identifies the Assets to be purchased and any Excluded Assets;
>
> (ii)    identifies the price to be paid for the Assets to be purchased, an amount at least equal to (x) the price identified in the Stalking Horse Agreement (if applicable) plus (y) any Break-Up Fee and Expense Reimbursement plus (z) $100,000.00 (such amount shall be referred to as the "Initial Overbid Amount"), provided however, that all Qualified Bids, including any credit bids by any lender, shall include sufficient cash to fund payment of the Break-Up Fee and Expense Reimbursement if the Successful Bid is not the Stalking Horse Bid;
>
> (iii)    includes an executed asset purchase agreement and a marked copy that identifies any proposed revisions to the Stalking Horse Agreement (if

---

[2] For purposes of this motion, to the extent that there are any inconsistencies between the description of the Bidding Procedures contained herein and the Bidding Procedures attached hereto, the terms of the actual Bidding Procedures attached hereto control.

applicable) or the form of asset purchase agreement provided by the Debtors (the "<u>Form APA</u>");

(iv)    identifies the Potential Bidder and the officer(s) or authorized agent(s) who will appear on behalf of such Potential Bidder and identifies the Potential Bidder's relationship with the Debtors, insiders, or creditors of the Debtors;

(v)    provides evidence, satisfactory to the Debtors and the Cyrus Entities of the Potential Bidder's financial wherewithal to consummate the proposed transaction;

(vi)    provides that such offer is not subject to any due diligence or financing contingency or further board or similar approval;

(vii)    provides for a good faith deposit (a "<u>Good Faith Deposit</u>") to be submitted to the Debtors on or before the Bid Deadline in an amount equal to not less than ten percent (10%) of the proposed purchase price;

(viii)    identifies any Contracts or Leases to be assumed and assigned in connection with the proposed purchase of the Assets and provides evidence of the Potential Bidder's ability to provide adequate assurance of future performance under such Contracts and Leases;

(ix)    provides that such offer is irrevocable until the later of (a) consummation of a transaction involving any other Potential Bidder for the same Assets and (b) the first business day that is thirty (30) days after the conclusion of the Sale Approval Hearing;

(x)    includes a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to submit an offer to purchase the Assets on the terms proposed by such Potential Bidder;

(xi)    contains the form of order approving the proposed transaction that the Potential Bidder would request the Debtors to submit to the Court, and a copy marked to show any changes from the proposed order filed with the Court.

9.    The Debtors will file a form Stalking Horse Agreement, Form APA, and Form Sale Order with the Court no later than **October 7, 2013,** which date is sufficiently before the Bid Deadline to allow Potential Bidders adequate time to review the Stalking Horse Agreement or the Form APA.  Upon request, the Debtors will provide copies of such documents to any Potential Bidder.

10.    A Stalking Horse Bid(s) acceptable to the Debtors, in conjunction with the Cyrus Entities, must be negotiated and finalized no later than **October 15 2013**.

11.     As soon as practicable after a Potential Bidder submits a bid, the Debtors may, in their business judgment, communicate with any Potential Bidder and may request any additional information to evaluate the bid. The Debtors will determine whether such bid is a Qualified Bid and will notify such Potential Bidder of such determination.  The Debtors, in conjunction with the Cyrus Entities, reserve the right to consider bids for the Debtors' Assets that do not conform to one or more of the aforementioned requirements, and may deem such bids to be Qualified Bids notwithstanding such requirements.  The Debtors may aggregate separate bids from unaffiliated Potential Bidders to create one Qualified Bid, provided, however, that all such Potential Bidders shall remain subject to the provisions of section 363(n) of the Bankruptcy Code regarding collusive bidding.

**C.     Due Diligence**

12.     Through and including the Bid Deadline, the Debtors, with the assistance of the CRO, will afford Potential Bidders the opportunity to conduct a due diligence investigation regarding the Assets in the manner determined by the Debtors, in their business judgment, to be reasonable and appropriate. The Debtors shall not be obligated to furnish access to any information of any kind whatsoever regarding the Assets after the Bid Deadline.

13.     Should any Potential Bidder desire additional or further information than is provided to all parties through the Bankruptcy Court docket, such Potential Bidder will be required to execute a confidentiality agreement in form and substance satisfactory to the Debtors in its business judgment.  Upon execution of such confidentiality agreement, the applicable Potential Bidder will be given access (through a virtual data room, site inspections or otherwise in the Debtors' discretion) to various financial data and other relevant and confidential information. The Debtors, together with GGG, will coordinate all requests for additional

12

information or access from Potential Bidders.  The Debtors may, in their discretion, coordinate

due diligence investigations such that multiple Potential Bidders have simultaneous access to

due diligence materials and/or simultaneous attendance at presentations or site inspections.  The

Debtors shall not be obligated to furnish access to any such information to any entity that does

not execute a confidentiality agreement in form and substance satisfactory to the Debtors in

their business judgment.

> **D.**     **Credit Bid**

14.     At the Auction, the Cyrus Entities, to the extent of the debtor-in-possession

financing it advances, may submit a credit bid for some or all of such Assets to the fullest extent

permitted under section 363(k) of the Bankruptcy Code.  The Cyrus Entities shall be deemed a

Qualified Bidder upon submission of a credit bid pursuant to and in compliance with the terms

hereof and may assign any credit bid at any time prior to the closing.

> **E.**     **The Auction**

15.     If two or more Qualified Bids are received on or before the Bid Deadline,

the Debtors shall conduct the Auction commencing on **October 28, 2013 at 10:00 a.m.

(Prevailing Eastern Time),** at the offices of Nelson Mullins Riley & Scarborough LLP in

Charlotte, North Carolina, to determine the Successful Bid.  The Auction may be transcribed

or videotaped.  The Auction may be adjourned or rescheduled without further notice by an

announcement of the adjourned date at the Auction.

> **F.**     **Auction Procedures**

16.     Only an entity that has submitted a Qualified Bid (a "Qualified Bidder") to

the Debtors and their counsel are eligible to participate in the Auction.  All participants shall

appear in person, by telephone, or through a duly authorized representative.  Prior to the

Auction, the Debtors, in conjunction with the Cyrus Entities, shall select the Qualified Bid that, in their business judgment, reflects the highest or otherwise best value for the Debtors' estates as the starting bid (the "Starting Auction Bid") and advise all participants at the Auction of the terms of the Starting Auction Bid.  If there is a Stalking Horse Agreement, the Stalking Horse Agreement shall be the Starting Auction Bid.  Qualified Bidders may then, at the Auction, submit bids that are better and higher than the Starting Auction Bid in an initial increment amount equal to the Initial Overbid Amount (only if there is a Stalking Horse Agreement) and subsequent increments of at least $100,000 (collectively, the "Overbid Increments"), provided that the Debtors and Cyrus Entities,, in their discretion, may adjust the Overbid Increments without further order of the Court.  Each Qualified Bidder shall be required to confirm at the Auction that it has not engaged in any collusion with respect to the bidding or sale.

17.     The Debtors, in conjunction with the Cyrus Entities, shall determine the Successful Bid and a second Qualified Bid to serve as the back-up bid (the "Back-Up Bid") at the Auction and notify all Qualified Bidders at the Auction of their determination of the Successful Bid and the Back-Up Bid.  Throughout the course of the Auction, all Qualified Bidders that submit bids shall be required to serve as the Back-Up Bid at their last offered bid in the event that such Qualified Bidder is selected as the Back-Up Bid.

18.     The Debtors, in conjunction with the Cyrus Entities, may adjourn, continue, or re-open the Auction, subject to any required approval of the Court, and reserve the right to adopt other and further rules and procedures for the Auction that, in their business judgment, will better promote the goals of the Auction.

### G.    Determination of Successful Bid

19.    As soon as reasonably practicable following the Bid Deadline (if only one Qualified Bid is submitted) or the Auction (if two or more Qualified Bids are submitted), the Debtors, in conjunction with the Cyrus Entities, shall review each Qualified Bid that has been submitted and determine, whether any Qualified Bid is the Successful Bid.  In making such determination, the Debtors in conjunction with the Cyrus Entities shall consider any factor that they deem relevant, including, without limitation, the purchase price, whether the Qualified Bid proposes to purchase less than all of the Assets, the payment of any Break-Up Fee and Expense Reimbursement, any benefit to the Debtors' estates from any proposal to assume liabilities of the Debtors, and those factors affecting the speed and certainty of consummating the sale of the Assets.

20.    As soon as practicable following notification of the determination of the Successful Bid, but prior to the Sale Approval Hearing, the Successful Bidder must execute an amendment to its proposed asset purchase agreement reflecting modifications agreed to by the Debtors and the Successful Bidder at the Auction (the amendment and the initial asset purchase agreement submitted with the bid are together, the "Asset Purchase Agreement"), which Asset Purchase Agreement shall be in all respects acceptable to the Debtors and the Cyrus Entities.

21.    The presentation of the Successful Bid and the Back-Up Bid to the Court for approval does not constitute the Debtors' acceptance of such bids.  The Debtors will be deemed to have accepted the Successful Bid only when such bid has been approved by the Court pursuant to the Sale Order and the sale of the Assets proposed in such bid has been consummated.

15

### H.       Back-Up Bid

22.     The Successful Bidder shall be required to consummate the purchase of the

Assets by **11:59 p.m. (Prevailing Eastern Time) on November 8, 2013.** If the Successful

Bidder fails to timely consummate the purchase of the Assets, or any part thereof, then the

Debtors shall be authorized, but not required, to consummate the sale of the Assets to the

Qualified Bidder that submitted the Back-Up Bid pursuant to the terms of such Back-Up Bid

(the "Back-Up Bidder") by **11:59 p.m. (Prevailing Eastern Time) on November 15, 2013.**

If the initial Successful Bidder fails to consummate the purchase of the Assets because of a

breach, default or failure to perform on the part of such initial Successful Bidder, the Debtors

reserves the right to seek all available damages from such Successful Bidder.

### I.       Reservation of Rights

23.     The Debtors reserve the right to determine whether any Qualified Bid is a

Successful Bid.

24.     The Debtors, with the consent of the Cyrus Entities, reserve the right to modify

the Bidding Procedures without the need for any further order of the Bankruptcy Court,

including, without limitation, (i) extending the deadlines set forth in the Bidding

Procedures, (ii) adjourning the Auction; and (iii) withdrawing any Assets from the sale

process at any time prior to or during the Auction.

### J.       Disposition of Good Faith Deposits

25.     All Good Faith Deposits shall be held in a separate escrow account for the

benefit of the Debtors for the Debtors' estates.   As soon as practicable following the

consummation of the sale of the Assets, any Good Faith Deposit received from a Qualified

Bidder who is not determined to be the Successful Bidder or a Back-up Bidder shall be

released from escrow and returned to such Qualified Bidder.  If the Successful Bidder or Back-up Bidder fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default or failure to perform on the part of such Successful Bidder or the Back-Up Bidder, the Debtors will have no obligation to return the Good Faith Deposit deposited by such Successful Bidder or Back-up Bidder, and such Good Faith Deposit shall irrevocably become property of the Debtors' estates without affecting or reducing any of the Debtors' other rights or claims against such Successful Bidder or Back-up Bidder.  If a Successful Bidder or Back-up Bidder fails to consummate the purchase of the Assets, or any part thereof, because of a breach, default or failure to perform on the part of the Debtors, the Good Faith Deposit deposited by such Successful Bidder or Back-up Bidder shall be returned to such Successful Bidder or Back-up Bidder.  If a Successful Bidder consummates the purchase of the Assets, the Good Faith Deposit deposited by such Successful Bidder shall be applied as a credit toward the purchase price for the Assets and the Good Faith Deposit of the Back-up Bidder shall be returned to the Back-up Bidder.

### K.    As Is, Where Is

26.    The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their estates, or their agents or representatives.  Except as otherwise expressly provided in these Bidding Procedures, any applicable Stalking Horse Agreement, or any applicable Asset Purchase Agreement, each Potential Bidder that submits a bid shall be deemed to acknowledge and represent that it (i) has had an opportunity to conduct any and all reasonable due diligence regarding the Assets prior to making its bid, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid,

and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith.

> **L.**    **Sale Approval Hearing.**

27.    The sale of the Assets and applicable Asset Purchase Agreement shall be presented for authorization and approval by the Court at the Sale Approval Hearing, which the Debtors propose be held on **October 29, 2013 at 10:00 a.m. (Prevailing Eastern Time)** at the United States Bankruptcy Court, Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina, subject to the availability of the Court.  The Sale Approval Hearing may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Approval Hearing.

<u>Form Asset Purchase Agreement and Sale Order</u>

28.    To facilitate the bidding process, the Debtors will file with the Court, on or before October 7, 2013, a Stalking Horse Agreement and a Form APA upon which bids for the Assets may be predicated.  The use of uniform agreements will enable the Debtors and other parties in interest to easily compare and contrast the differing terms of any bids that may be received.  The Debtors reserve the right to refuse to consider any bid that does not conform to the form agreements.

29.    In addition, all Qualified Bids must include a proposed order approving the sale of the Assets to the Potential Bidder and a marked copy of their proposed order showing their requested changes from the Debtors' submitted proposed Sale Order.

**Notice Procedures**

30.     The Debtors also request approval of the proposed form and manner of notice of the Bidding Procedures, the Sale, the Auction, and Sale Hearing.  Specifically, no later than **October 2, 2013**, the Debtors will serve a Notice of Proposed Sale, Bidding Instructions, Auction, and Sale Hearing, Deadline to Object to Sale, Deadline to Object to Assumption and Assignment of Executory Contracts and Leases and Establishment of Cure Amounts, and Hearing on Assumption and Assignment of Executory Contracts and Leases and Cure Amounts, which shall be filed with the Court (the "Sale and Assumption, Assignment, and Cure Amount Notice"), together with the Motion seeking approval to sell the Assets, by first class mail and, if available, electronic mail or facsimile transmission on the following (the "Notice Parties"):

    (i)    the Bankruptcy Administrator;

    (ii)    any entity known or reasonably believed to have asserted a security interest in or lien against any of the Assets;

    (iv)    all counterparties to Contracts and Leases;

    (v)    all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; and

    (vi)    all parties that have requested notice in the case.

31.     The CRO considered publishing a public notice of the Auction in *The Wall Street Journal* or *USA Today* but concluded that the cost far outweighed any perceived benefit.  In the CRO's business judgment the scarce resources of the estate should be spent maintaining basic operational expenses and the chapter 11 costs through the closing instead of purchasing an expensive advertisement unlikely to generate any additional bidders.

32.     Additionally, as soon as practicable following the determination of the Successful Bid and entry of the Sale Order, the Debtors shall serve such Sale Order by

19

telecopy, electronic mail transmission, or overnight delivery on the Notice Parties.

## Assumption and Assignment Procedures

33.     To facilitate and consummate the sale of the Assets, the Debtors seek authority to assume and assign certain Contracts and Leases to the Successful Bidder.  Due to the nature of the bidding process, it is impossible for the Debtors to currently identify which Contracts and Leases, if any, will require assumption and assignment to the Successful Bidder.  As such, the Debtors further seek authority to establish the following Assumption and Assignment Procedures.

34.     As soon as practicable after the Debtors ascertain which Contracts and Leases could be assumed and assigned pursuant to any sale of the Assets, but not later than **October 31, 2013**, the Debtors will file the Sale and Assumption, Assignment and Cure Amount Notice with the Court and serve such notice by first class mail on the non-Debtor counterparties to such Contracts and Leases.

35.     The Cure Notice will include (i) the title of the Contract or Lease to be assumed, (ii) the name of the counterparty to such Contract or Lease, (iii) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default under such Contract or Lease in accordance with sections 365(b) and (f)(2) of the Bankruptcy Code (the "Cure Amount"), (iv) the proposed effective date of the assumption and assignment, (v) the identity of the Stalking Horse Bidder, if one exists, and a statement as to such Stalking Horse Bidder's ability to perform the Debtors' obligations under such Contract or Lease, and (vi) the deadline by which any counterparty to such Contract or Lease must object to the Cure Notice.  The Debtors reserve the right to supplement and modify the Sale and Assumption, Assignment, and Cure Amount Notice at any time, provided that to the extent that the Debtors add a Contract or

20

Lease or modify the Cure Amount, the affected party shall receive a separate notice and an opportunity to object to such addition or modification.

36.    Any objection to the assumption and assignment of any Contract or Lease identified on the Sale and Assumption, Assignment, and Cure Amount Notice, including, without limitation, any objection to the Cure Amount or to the ability of a Successful Bidder to provide adequate assurance of future performance under such Contract or Lease, must (i) be in writing, (ii) set forth the basis for the objection as well as any cure amount that the objector asserts to be due (in all cases with appropriate documentation in support thereof), and (iii) be filed with the Clerk of the Court, United States Bankruptcy Court for the Western District of North Carolina, 401 West Trade Street, Room 111, Charlotte, North Carolina 28202 and served on  Nelson Mullins Riley & Scarborough LLC, 4140 Parklake Avenue, Suite 200, Raleigh, North Carolina 27612 (Attn:  Terri L. Gardner, Esq.), so as to be **actually received** no later **than November 3, 2013 at 5:00 p.m. (Prevailing Eastern Time)** (the "Assignment and Cure Objection Deadline").

37.    Any request for adequate assurance information regarding the Successful Bidder (a "Request for Adequate Assurance") must include an email address, postal address and/or facsimile number to which a response to such request will be sent.  Upon receiving a Request for Adequate Assurance, the Debtors shall promptly provide such party with any non-confidential information reasonably related to adequate assurance by email, facsimile or overnight delivery.

38.    If no objection to the proposed assumption and assignment of a Contract or Lease is timely received by the Assignment and Cure Objection Deadline, then the assumption and assignment shall be deemed authorized and the respective Cure Amount set forth in the Cure

Notice shall be binding upon the counterparty to the Contract or Lease for all purposes and will constitute a final determination of total Cure Amount required to be paid by in connection with such assumption and assignment to the Successful Bidder.

39.    To the extent that any entity does not timely object as set forth above, such entity shall be (i) forever barred from objecting to the assumption and assignment of any of the Contracts and Leases identified on the Cure Notice, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance, (ii) deemed to have consented to the applicable Cure Amount, if any, and to the assumption and assignment of the applicable Contract or Lease, (iii) bound to such corresponding Cure Amount, if any, (iv) deemed to have agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code, (v) deemed to have agreed that all defaults under the applicable Contract or Lease arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that the Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the assignment, and from and after the date of the assignment the applicable Contract or Lease shall remain in full force and effect for the benefit of the Successful Bidder and such entity in accordance with its terms, (vi) deemed to have waived any right to terminate the applicable Contract or Lease or designate an early termination date under the applicable Contract or Lease as a result of any default that occurred and/or was continuing prior to the assignment date, and (vii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Contract or Lease.

40.    If no objection to the proposed assumption and assignment of a Contract or Lease

is received by the Assignment and Cure Objection Deadline, counsel for the Debtors may submit to the Court a certificate of no objection and a form of order (a "Certificate of No Objection") granting the Debtors the authority, but not the obligation, for the assumption and assignment, and serve such Certificate of No Objection on the counterparty to such Contract or Lease.

41.     If an objection is timely received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at such later date set by the Court. The pendency of a dispute relating to the Cure Amount will not prevent or delay the assumption and assignment of any Contract or Lease.  If an objection is filed only with respect to the cure amount listed on the Cure Notice, the Debtors may file a Certificate of No Objection as to assumption and assignment only and the dispute with respect to the cure amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, before the Court.  The Debtors intend to cooperate with the counterparties to the Contracts and Leases to be assumed and assigned by the Debtors to attempt to reconcile any difference in a particular Cure Amount.

42.     The Debtors shall, after the consummation of the closing of the sale of the Assets, file with the Court and serve on the non-Debtor counterparties to the Leases and Contracts, a final list of those Leases and Contracts that were actually assumed and assigned to the Successful Bidder at the closing of the sale of the Assets.  Although authorized to assume and assign Leases and Contracts, assumption and assignment shall not occur until the Debtors file the list of assumed and assigned Lease and Contents.

43.     The Debtors request that the Court find that any anti-assignment provisions included in, or otherwise purporting to affect, any Contracts and Leases to be assumed and

23

assigned by the Debtors are unenforceable under section 365(f) of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

## I.      The Bidding Procedures are Reasonable and Appropriate

44.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or public auction. The Debtors have determined that the sale of the Assets, pursuant to the Bidding Procedures and by public auction, will ensure that the bidding process with respect to the Assets is fair and reasonable and will yield the maximum value for the Debtors' estates and their creditors.

45.     Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. See In re Financial News Network, Inc., 126 B.R. 152, 156 (S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

46.     The Bidding Procedures set an expedited schedule for conducting the Auction and the Sale Approval Hearing.  The Budget reflects that the Debtors are operating on limited cash through early November, 2013, after which time the DIP financing will have been utilized unless the DIP Lender agrees to advance additional funds.  Therefore, the Debtors are seeking to proceed with the sale of the Assets in an orderly but expedited basis.  Thus, an expedited 363 sale process that provides adequate time for marketing and soliciting of bids is the best mechanism to maximize value under the circumstances.

47.     Accordingly, the Debtors request that the Court approve the Bidding Procedures, including the timetable for the sale process set forth therein.

24

**II.**   **The Stalking Horse Protections Should Be Approved**

48.   Approval of the Break-Up Fee and the Expense Reimbursement (together, the "Stalking Horse Protections") is governed by the business judgment rule in some jurisdictions and by the general administrative expense jurisprudence under section 503(b) of the Bankruptcy Code in other jurisdictions.  See In re 995 Fifth Avenue Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989); Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999). In O'Brien, the Third Circuit concluded that the determination as to whether to approve break-up fees or expense reimbursements "depends upon the requesting party's ability to show that the fees [or expenses] were actually necessary to preserve the value of the estate." O'Brien, 181 F.3d at 535.

49.   The O'Brien court identified at least two instances in which bidding incentives may provide benefit to the estate.  First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

50.   Here, the Stalking Horse Protections should be approved because they will provide a clear benefit to the Debtors' estates.  The Break-Up Fee and Expense Reimbursement will enable the Debtors to secure an adequate floor for the purchase price of the Debtors' Assets and, thus, any competing bids will be materially higher or otherwise better than any

agreement that might be entered into without the Stalking Horse Bidder.

51.   The Stalking Horse Protections are also substantial incentives for a potential buyer to pursue purchase of the Debtors' Assets on an expedited basis.  The Stalking Horse Protections are designed to encourage a potential buyer to step forward and enter into a Stalking Horse Agreement, knowing that if it is not the Successful Bidder, it will be compensated for the investment of time and money required to complete its due diligence.  The existence of the Stalking Horse Protections thus will increase the likelihood of a buyer being willing to spend the resources to complete the due diligence and enter into a Stalking Horse Agreement.

52.   If needed, GGG or another expert will provide expert testimony that a break-up fee and expense reimbursement in the amount set forth herein is standard in the marketplace for companies of similar size and complexity as the Debtors.

53.   Moreover, payment of the Stalking Horse Protections will not diminish the Debtors' estates. The Debtors do not intend to terminate any Stalking Horse Agreement if to do so would cause it to incur an obligation to pay the Stalking Horse Protections unless the alternative bid exceeds the consideration offered by the Stalking Horse Bidder by an amount sufficient to pay the Stalking Horse Protections.  Therefore, even if the Stalking Horse Bidder is ultimately not determined to be the Successful Bidder, the Debtors' estates will still have benefited from the higher floor established by the improved bid, thereby increasing the likelihood that the price at which the Assets are sold reflects their true worth.

54.   The Debtors submit that the Stalking Horse Protections and Overbid Increments will not chill bidding on the Assets and will clearly benefit the Debtors' estates.  Accordingly, the Debtors request that the Court approve and authorize the Break-Up Fee, the Expense Reimbursement, and Overbid Increments.

**III.**    **The Notice Procedures are Reasonable and Appropriate**

55.    Pursuant to Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the proposed sale, and the deadline for filing objections.  The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the proposed sale of the Assets, the Bidding Procedures, the Auction, the Cure Amount, and the Sale Approval Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well all those parties that have expressed a bona fide interest in acquiring the Assets.  Based upon the foregoing, the Debtors respectfully request that the Court approve the notice procedures proposed herein, including the form and manner of service of the Sale Notice.

**IV.**    **Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved**

    **A.**    **Assumption and Assignment Based on Debtors' Business Judgment**

56.    As stated above, to facilitate and effect the sale of their assets, the Debtors also seek authority to assume and assign certain Contracts and Leases to the Successful Bidder.  The Contracts and Leases which will be assumed and assigned will be determined by the Successful Bidder.

57.    Section 365(a) and (b) of the Bankruptcy Code authorize trustees or debtors to assume executory contracts or unexpired leases subject to the Court's approval, and requires such debtors to satisfy certain requirements at the time of assumption. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease…" 11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or

27

executory contract, providing in relevant part that:

>(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the Debtors may not assume such contract or lease unless, at the time of assumption of such contract or lease, the Debtors—
>
>(A)    cures, or provides adequate assurance that the Debtors will promptly cure, such default . . . ;
>
>(B)    compensates, or provides adequate assurance that the Debtors will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
>(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

58.    It is well established that the court should approve a motion to assume or reject an executory contract if the Debtors or debtor's decision is based on its "business judgment." See Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).

59.    To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006).  A court should approve a Debtors or debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See Computer Sales Intl, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985).

60.    In the present case, procedures set forth herein for the assumption and assignment of certain Contracts and Leases of the Debtors to the Successful Bidder meet

the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code. It may be determined that the assumption and assignment of Contracts and Leases are necessary for any Successful Bidder to conduct business going forward, and thus no purchaser would take the Assets without certain Contracts and Leases. Therefore, the ability to provide for assumption and assignment of such Contracts and Leases is essential to inducing the highest and best offer for the Assets. Further, upon consummation of the proposed sale of the Assets, the Debtors will no longer continue to operate the Debtors' business and will therefore have no use for any of the Contracts and Leases utilized in the business. Finally, the proposed Assumption and Assignment Procedures ensure that all counterparties to Contracts and Leases to be assumed and assigned will have ample notice of such relief and an opportunity to contest any asserted Cure Amount, as well as the ability of the Successful Bidder to provide adequate assurance of future performance.

61.     Therefore, the Debtors submit that the Assumption and Assignment Procedures are fair and reasonable and respectfully request that the Court approve the Assumption and Assignment Procedures and authorize the Debtors to assume and assign any Contracts and Leases of the Debtor to the Successful Bidder.

**B.     Adequate Assurance of Future Performance**

62.     A debtor may assign an executory contract or unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. 11 U.S.C. § 365(f)(2).

63.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."

29

EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992); In re Rachels Indus., Inc., 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990).

64.     Pursuant to the Bidding Procedures, in order to submit a Qualified Bid for the Assets, all Potential Bidders must provide evidence of such Potential Bidder's ability to provide adequate assurance of future performance under the Contracts and Leases to be assumed and assigned. Moreover, the Assumption and Assignment Procedures permit the non-Debtor counterparties to such Contracts and Leases to request adequate assurance information regarding the Successful Bidder, and afford such counterparties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under such Contracts and Leases.   Accordingly, in this regard, the Assumption and Assignment Procedures are reasonable and appropriate and support approval of the assumption and assignment of Contracts and Leases to the Successful Bidder.

### C.     Anti-Assignment Provisions Should be Deemed Unenforceable

65.     To facilitate the assumption, assignment and sale of Contracts and Leases, the Debtors also request that the Court enter an order providing that any anti-assignment provisions contained in, or otherwise purporting to affect, the Contracts and Leases to be assumed and assigned shall not restrict, limit or prohibit the assumption, assignment and sale of such Contracts and Leases, and that such provisions are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

66.     Section 365(f)(1), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, *e.g.*, Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no

principle of bankruptcy or contract law precludes us from permitting the debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), cert. denied, 522 U.S. 1148 (1998).  Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, *e.g.*, In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (finding that section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtors; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

67.    Accordingly, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of any Contracts or Leases to the Successful Bidder and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

**V.    Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

68.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that "an order authorizing the Debtors to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

69.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules

6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6004.10 at 6004-18 (L. King., 15th rev. ed. 2008).   The treatise further provides that if an objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

70.      As described above, time is clearly of the essence.   An immediate sale of the Debtors' Assets is needed due to the limited debtor-in-possession financing.   Therefore, to maximize the value received for the Assets and minimize accruing liabilities, the Debtors seek to consummate the sale of the Debtors' Assets to the Successful Bidder as soon as possible following the Sale Approval Hearing.   Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the proposed sale of the Assets is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

## RESERVATION OF RIGHTS

71.      The Debtors expressly reserve the right to amend, modify, and/or supplement the relief requested in this Motion in all respects, including, but not limited to, the proposed Bid Procedures attached hereto, prior to or at the applicable hearing and reserves the right to withdraw this Motion, in whole or in part, prior to or at the applicable hearing.

## NOTICE AND NO PRIOR RELIEF

72.      Notice of this Motion has been given to: (1) the Bankruptcy Administrator; (2) those persons who have formally appeared in the Chapter 11 cases and requested service

32

pursuant to Rule 2002 of the Bankruptcy Rules; (3) the Debtors' 20 largest unsecured creditors; (4) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules; and (5) all counter parties to the Leases and Contracts.  In light of the nature of the relief requested, and given the fact that no official committees have been established in this case, the Debtors respectfully submit and request that this Court so find, that no further notice of this Motion be required.

73.     No prior motion for the relief requested herein has been made to this Court or any other court.

**WHEREFORE,** the Debtors respectfully request that the Court schedule a hearing on this Motion on **October 1, 2013 at 9:30 am** at the United States Bankruptcy Court, Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina and thereafter enter an order granting the relief requested herein and granting such other and further relief as this Court deems just and proper.

Dated:  September 25, 2013

NELSON MULLINS RILEY & SCARBOROUGH LLP

/s/ Terri L. Gardner
Terri L. Gardner
State Bar No. 9809
4140 Parklake Avenue, Suite 200
Raleigh, NC 27612
Telephone: (919) 329-3882
Facsimile: (919) 329-3799
terri.gardner@nelsonmullins.com

*Proposed Attorneys to the Debtors and Debtors in Possession*

Designline Corporation & USA
DIP Budget
Draft   9/11/2013

| | | 6 weeks | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #<br>Period End | | 9/20/2013 | 9/27/2013 | 10/4/2013 | 10/11/2013 | 10/18/2013 | 10/25/2013 | 11/1/2013 | 11/8/2013 | 11/15/2013 | 11/22/2013 |
| FUNDS AT BEGINNING OF PERIOD | | $ - | $ 202,363 | $ 89,342 | $ 1,036,701 | $ 1,005,629 | $ 754,386 | $ 725,837 | $ 698,723 | $ 631,608 | $ 512,365 |
| RECEIPTS: | | | | | | | | | | | |
| A. | Cash Sales | | - | - | - | - | - | - | - | - | - |
| | Minus: Cash Refunds | | - | - | - | - | - | - | - | - | - |
| | Net Cash Sales | | - | - | - | - | - | - | - | - | - |
| B. | Accounts Receivable | | - | - | - | - | - | - | - | - | - |
| D. | Other Receipts Draw on DIP) | 475,000 | - | 975,000 | - | - | - | - | - | - | - |
| TOTAL RECEIPTS | | 475,000 | - | 975,000 | - | - | - | - | - | - | - |
| TOTAL FUNDS AVAILABLE FOR | | 475,000 | 202,363 | 1,064,342 | 1,036,701 | 1,005,629 | 754,386 | 725,837 | 698,723 | 631,608 | 512,365 |
| OPERATIONS (Line 1 + Line 3) | | | | | | | | | | | |
| DISBURSEMENTS | | | | | | | | | | | |
| A. | Advertising | | - | - | - | - | - | - | - | - | - |
| B. | Bank Charges | | - | - | - | - | - | - | - | - | - |
| C. | Contract Labor | 26,799 | 3,109 | 3,109 | 3,109 | 3,109 | 3,109 | 3,109 | 3,109 | 3,109 | 3,109 |
| D. | Fixed Asset Payments | - | - | - | - | - | - | - | - | - | - |
| E. | Insurance | 85,000 | - | - | - | 132,000 | - | - | 40,000 | - | - |
| F. | Inventory Payments | - | - | - | - | - | - | - | - | - | - |
| G. | Leases | 5,350 | - | 3,200 | 1,434 | 3,200 | 1,434 | - | - | 3,200 | 1,434 |
| H. | Manufacturing Supplies | - | - | - | - | - | - | - | - | - | - |
| I. | Office Supplies | - | - | - | - | - | - | - | - | - | - |
| J. | Payroll - Net | 63,786 | 8,786 | 8,786 | 8,786 | 8,786 | 8,786 | 8,786 | 8,786 | 8,786 | 8,786 |
| L. | Rent | 41,289 | 85,329 | - | - | 85,329 | - | - | - | 85,329 | - |
| M. | Repairs & Maintenance | - | - | - | - | - | - | - | - | - | - |
| N. | Secured Creditor Payments (DIP) | - | - | - | - | - | - | - | - | - | - |
| O. | Taxes Paid - Payroll | 19,697 | 2,197 | 2,197 | 2,197 | 2,197 | 2,197 | 2,197 | 2,197 | 2,197 | 2,197 |
| P. | Taxes Paid - Sales & Use | - | - | - | - | - | - | - | - | - | - |
| Q. | Taxes Paid - Other | - | - | - | - | - | - | - | - | - | - |
| R. | Telephone | 694 | 3,600 | - | - | 3,600 | - | - | - | 3,600 | - |
| S. | Travel & Entertainment | - | - | - | - | - | - | - | - | - | - |
| T. | Quarterly Fees to BA | - | - | - | 4,875 | - | - | - | - | - | - |
| U. | Utilities | 10,023 | - | 350 | 671 | 3,023 | 3,023 | 3,023 | 3,023 | 3,023 | 3,023 |
| V. | Vehicle Expenses | - | - | - | - | - | - | - | - | - | - |
| W. | Other Operating Expenses | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| TOTAL DISBURSEMENTS (Sum of 5A thru W) | | 272,638 | 113,021 | 27,642 | 31,072 | 251,244 | 28,549 | 27,115 | 67,115 | 119,244 | 28,549 |
| ENDING BALANCE (Line 4 Minus Line 6) | | $ 202,363 | $ 89,342 | $ 1,036,701 | $ 1,005,629 | $ 754,386 | $ 725,837 | $ 698,723 | $ 631,608 | $ 512,365 | $ 483,816 |
| Accruals | | | | | | | | | | | |
| K. | Debtor Counsel Fees* | 140,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| K. | Debtor CRO and Advisor Fees* | 80,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| K. | DIP Lender Fees* | 140,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| K. | UCC Fees* | 70,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| | Total | $ 430,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 | $ 60,000 |
| | Cumlative | $ 430,000 | $ 490,000 | $ 550,000 | $ 610,000 | $ 670,000 | $ 730,000 | $ 790,000 | $ 850,000 | $ 910,000 | $ 970,000 |
| | Positive (deficit) | $ (227,638) | $ (400,658) | $ 486,701 | $ 395,629 | $ 84,386 | $ (4,163) | $ (91,278) | $ (218,392) | $ (397,636) | $ (486,184) |