FILED & JUDGMENT ENTERED
Steven T. Salata

January 20 2017

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

/s/ J. Craig Whitley
J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re: ) | Case No. 13-31943 |
| ) | Chapter 11 |
| DESIGNLINE CORPORATION, ) | |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Case No. 13-31944 |
| ) | Chapter 11 |
| DESIGNLINE USA, LLC, ) | (Jointly Administered) |
| ) | |
| Debtor. ) | |
| ) | |

**ORDER DENYING THE LIQUIDATING TRUSTEE'S**
**MOTION TO OBTAIN LITIGATION FINANCING**

This matter is before the Court on the request by Elaine Rudisill, liquidating trustee of the DesignLine Corporation bankruptcy estate, to obtain financing to prosecute law suits against the debtors' former officers and directors. Specifically, the trustee proposes to "sell" a "portion of the proceeds" from three adversary proceedings to RDSL 1603-421 LLC (RDSL), an affiliate of Parabellum Capital LLC. Because this unusual agreement between the trustee and RDSL constitutes champerty under North Carolina law, the proposal cannot be approved. The trustee's motion is thus denied.

**Facts and Procedural History**

Approximately ten years ago, the debtors and related entities began operations and preparations to build hybrid buses in Charlotte, North Carolina. The venture was not successful and ultimately culminated in a bankruptcy filing in Delaware in August 2013. The Delaware Bankruptcy Court transferred venue of the case to this Court in September 2013.

On March 17, 2014, the Court confirmed a Chapter 11 Plan wherein the debtors' assets, consisting primarily of un-asserted causes of action, were to be liquidated. Pursuant to the Confirmation Order, the debtors' assets were transferred to a trust, and Elaine Rudisill was appointed liquidating trustee.

The trustee retained Benesch, Friedlander, Coplan & Aronoff, LLP and Moon Wright & Houston, PLLC (together, the firms) to assist her in liquidating the trust assets. At that time, the firms had already been heavily involved in the case having proposed the Plan as counsel for the official unsecured creditors committee.

Since the effective date of the Plan, the trustee has initiated approximately 115 adversary proceedings. Only a handful remain unresolved. Of those remaining adversary proceedings, three are relevant to the trustee's current motion.[1]

These three adversary proceedings involve complex, interrelated litigation against the debtors' former officers and directors (the Insider Actions) that range from claims of breach of fiduciary duty and unjust enrichment to bribery and RICO violations. The Court has previously described the scope of the trustee's allegations as breathtaking. One action alone raises 131 separate causes of action against eighteen different defendants who reside all across the globe. Most of the defendants have requested that these claims be resolved in United States District

---

[1] *Rudisill v. Keating, et al.* (Adv. Pro. 15-3136); *Rudisill v. Glosson, et al.* (Adv. Pro. 15-3138) *Rudisill v. Combs, et al.* (Adv. Pro. 15-3139).

Court by juries.  Such trials could take weeks to conclude.  Further entangling the proceedings, the defendants have now begun to file third-party complaints for indemnification and contribution against each other and against former directors the trustee chose not to sue.  With discovery barely underway, the cost of this litigation is already monumental.

The primary defendants of the Insider Actions have been able to fund their defense efforts by using proceeds from insurance policies purchased by the debtors (commonly referred to as D&O Policies).  The D&O Policies have been discussed at various points in the proceedings.  However, there does not appear to be a clear consensus on the full amount available under the policies.  For purposes of this decision, it can safely be assumed that the policy limits are well into the millions of dollars.

In July 2015, before she filed the Insider Actions, the trustee began to investigate her options on how to fund this titanic litigation.[2]  Over a year later, and at the start of the discovery period, the trustee sought approval of a "Prepaid Forward Purchase Agreement" between the trustee and RDSL and a "Retention Agreement" between the trustee and the firms.[3]  The trustee terms this agreement a "sale" of a portion of the "proceeds" of the Insider Actions in exchange for RDSL advancing her legal costs and expenses [First Sale Motion, Doc. 689].

The trustee initially sought to seal the Purchase and Retention Agreements *in toto*, including from those she owes fiduciary duties [First Motion to Seal, Doc. 688].  Numerous parties objected to both motions, including the bankruptcy administrator and parties who are both defendants in the Insider Actions and, at the same time, putative creditors of the bankruptcy estate (the opponents).

---

[2] From an outside perspective, it appears that, rather than attempting to pare these actions down to make them more manageable and affordable to litigate, the trustee chose to file the actions as currently pled knowing she would need financing to see them through.

[3] This was the first time the trustee indicated to the Court that she lacked sufficient funds to prosecute these actions.

After a hearing on October 11, 2016, the Court denied the First Motion to Seal because the trustee failed to satisfy the requirements set forth in *Legal Newsline v. Garlock Sealing Techs. LLC*, 518 B.R. 358, 363 (W.D.N.C. 2014), to justify such "extraordinary relief." The Court continued the First Sale Motion and permitted the trustee to amend her attempt to seal on a more limited basis [Doc. 705].

A further hearing was held on November 2, 2016 at which the trustee sought to seal only certain aspects of the Purchase and Retention Agreements while disclosing others [Second Motion to Seal, Doc. 706]. The same parties objected again. The trustee used the November 2 hearing to supplement the evidentiary record regarding her business judgment. The Court admitted testimony of the trustee and of her attorney, Andrew T. Houston.

By order dated November 9, 2016 [Doc. 726], the Court permitted the trustee to shield her attorneys' proposed litigation budget from public inspection as work product but denied all of her remaining requests to seal. In the same order, the Court denied the trustee's First Sale Motion because: (1) the trustee's testimony at the November 2 hearing made apparent that the Purchase and Retention Agreements as drafted did not comport with her stated intentions. Since the trustee's understanding of the deal differed so greatly from the terms set forth in the written agreements, the Court concluded that there had not been a meeting of the minds; (2) it appeared that the terms of the Retention Agreement purported to grant the firms, and potentially RDSL, a say and perhaps sole discretion in whether to settle these actions; and (3) the Court was unable to determine whether the agreements complied with the North Carolina Rules of Professional Conduct regarding the attorney-client relationship, whether the trustee could fulfill her fiduciary duties to creditors and comply with the agreements, and whether the agreements constituted

champerty. The trustee and RDSL were given leave to amend their agreements once more, bringing us to the matter at hand.

As with her prior efforts, the current deal is set out in two documents, a "Prepaid Forward Purchase Agreement" between the trustee and RDSL and a "Retention Agreement" between the trustee and the firms (together, the current iteration of these documents will be referred to as the Agreements).[4] To the trustee's credit, she attempted to address all the concerns previously noted in the November 9, 2016 order. The Agreements are now fully unredacted (save the litigation budget), substantially pared down from prior versions, and include savings clauses that state the Agreements are not to be interpreted to "alter any rules of professional conduct" or "restrict any fiduciary obligation."

Per the Agreements, RDSL is to advance the costs of litigating the Insider Actions on a quarterly basis. The litigation budget contemplates this arrangement continuing through any appeals. Should RDSL make the litigation advances through the time that the trustee succeeds in the Insider Actions, RDSL is repaid its litigation advances and receives a substantial interest in the remaining proceeds of those actions. The trustee calls this a "sale" of the "litigation proceeds" with the "Purchase Price" being the "litigation advances."

Although the trustee contends otherwise, the Agreements do not require RDSL to make any advances. Should RDSL refuse to fund the litigation, even absent cause, RDSL remains entitled to be repaid its litigation advances if the trustee succeeds in the Insider Actions.

---

[4] In the prior two agreements, the trustee was represented by the firms which are the same attorneys litigating the Insider Actions and also are parties to the negotiations and Agreements. In the order denying the trustee's second attempt to have this agreement approved, the Court advised the trustee that she would be wise to seek independent counsel in crafting these bargains given the potentially divergent interests facing the firms [Doc. 726]. At the latest hearing, the trustee's counsel reported that the trustee had engaged independent counsel to review the current sale documents and still wished to go forward with the deal as amended.

5

In the latest Retention Agreement, the firms agree to cut their rates and switch their compensation method from billing hourly to a hybrid contingency fee. The firms would be paid a twenty-percent contingency fee of the litigation proceeds remaining after RDSL is reimbursed for its litigation advances and after the firms are reimbursed any outstanding hourly rate fees.

The remaining eighty-percent of the litigation proceeds are to be divided between RDSL, which receives twenty-five percent of the net, and the liquidating trust to be distributed to creditors after deducting the trustee's expenses.

To be clear, the Agreements do not contemplate a bare assignment of the proceeds of the Insider Actions wherein RDSL will advance funds and then sit idly until the end of the cases. Instead, the Agreements require an ongoing relationship between the trustee and RDSL for the entire duration of the Insider Actions. For instance, the litigation will not be funded all at once; the trustee and her attorneys are required to go back to RDSL on a quarterly basis to request funding. Should the firms withdraw from the case, the trustee is required to consult with RDSL regarding substitute counsel. Finally, any request to increase the litigation budget must be approved by RDSL.

**Parties' Positions**

The opponents' arguments can be broadly summarized into three categories. First, the opponents assert that the Agreements constitute an impressible modification to an already substantially consummated plan in violation of 11 U.S.C. §§ 1127(b) and 1101(2). Second, the opponents believe the "sale" is illusory in that RDSL has no affirmative duty to continue to fund and is essentially paying a "purchase price" that it will receive back in full. Third, and the sole issue subject to this order, the opponents argue that the Agreements violate North Carolina law because RDSL would exercise sufficient control over the litigation so as to constitute champerty.

6

According to the opponents, this source of control stems from specific provisions requiring RDSL's input into future decisions and from RDSL's power to cut off funding.

The trustee vigorously refutes each objection. She asserts that without this funding arrangement, she will not be able to continue to litigate the Insider Actions and, as a result, creditors will lose their only chance at recovery in this bankruptcy.[5] The trustee believes the Agreements fall within the broadly worded provisions of the Plan permitting a sale of trust assets. Regarding champerty, the trustee argues that RDSL has no control over the litigation and would be but a passive onlooker.

Because the Agreements are champertous and violate North Carolina public policy, only the latter argument need be addressed. The Court makes no determinations on whether the Agreements are in fact a sale, whether the Agreements require a modification of the Plan, whether the Plan is substantially consummated, or whether the Agreements are illusory.

## Analysis

As an initial observation, the practice of litigation financing is in its infancy and is virtually unheard of in bankruptcy litigation. The trustee could only point to two unpublished bankruptcy decisions from other jurisdictions where a liquidating trustee's funding request was approved. *In re Superior Nat. Ins. Gr*, No. 1:00-BK-14099-GM, 2014 WL 51128 (Bankr. C.D. Cal. Jan. 7, 2014); *In re Complete Retreats, LLC*, No. 06-50245, 2011 WL 1434579 (Bankr. D. Conn. Apr. 14, 2011). Neither case is controlling nor analogous to the facts at hand.[6] While

---

[5] The Court did not consider this argument. Alleged violations of the Plan, the Bankruptcy Code, or public policy cannot be ignored because the trustee lacks funds to prosecute actions she initiated knowing of their magnitude.

[6] An examination of the procedural history and record in *In re Superior Nat. Ins. Gr*, No. 1:00-BK-14099-GM, 2014 WL 51128 (Bankr. C.D. Cal. Jan. 7, 2014), reveals that the request for funding faced only a limited objection wherein JP Morgan Chase refuted that the trustee could obtain *future* financing without court approval. *Id.*, ECF Nos. 1518 & 1520. Before the decision cited by the trustee, the Bankruptcy Court for the Central District of California approved the otherwise unopposed funding request and reserved the question of whether future approval was required. *Id.*, ECF No. 152. The decision cited by the trustee determines that under the Plan documents in that case future funding requests would require court approval. *Id.* at \*10. The court did not consider whether the

7

RDSL suggests that litigation financing is the future of complex litigation and intimated that the practice is widespread in other jurisdictions, a search of reported cases would suggest otherwise. More importantly, RDSL could not identify a single case applying North Carolina law on champerty that approved of an agreement such as this one.

This scant case law support should come as no surprise. Evidence suggests that even the ancient Greeks and Romans resented the notion that an outsider could fund an action on behalf of a litigant. *Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363, 372 (2d Cir. 1999) (citations omitted). In fairness, some, perhaps many, jurisdictions have since softened these negative views and allow what were once considered champertous agreements. 7 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 15:4 (4th ed. 2015) (noting maintenance and champerty are now "viewed by the courts with less disfavor than formerly"). However, the only relevant jurisdiction in this inquiry, North Carolina, has retained the proscriptions against champerty and maintenance. *High Voltage Beverages, L.L.C. v. Coca-Cola Co.*, No. 3:08-CV-367, 2010 WL 2342458, at *2 (W.D.N.C. June 8, 2010) ("[C]hamperty and maintenance are not dead in North Carolina. This proposition is so obvious that it hardly warrants any further explanation." (citations omitted)).

Under North Carolina law, "[c]hamperty and maintenance generally occurs when two or more parties make an arrangement to divide the proceeds of litigation between the owner of the

---

agreement constituted champerty. In any event, the proscription against champerty does not appear to be as stringent in California as in North Carolina. *See Martin v. Freeman*, 31 Cal. Rptr. 217, 218 (Ct. App. 1963) ("California has never adopted the common-law doctrine of champerty and maintenance. We do have, however, certain statutes of precise and limited content which proscribe a very few of the many activities which two centuries and more ago were considered champertous." (citations omitted)).

As for *In re Complete Retreats, LLC*, No. 06-50245, 2011 WL 1434579 (Bankr. D. Conn. Apr. 14, 2011), the Bankruptcy Court for the District of Connecticut concluded that it must apply Connecticut law which "clearly states: '[T]he common law doctrines of champerty and maintenance as applied to civil actions *have never been adopted in this state*, and the only test is whether a particular transaction is against public policy.' " *Id*. at *2 (citation omitted).

8

chose in action and the party who either supports or acts to enforce the litigation." *High Voltage Beverages, LLC v. Coca-Cola Co.*, No. 3:08CV367, 2010 WL 5924318, at *15 (W.D.N.C. Dec. 16, 2010). Maintenance is " 'an officious intermeddling in a suit, which in no way belongs to one, by maintaining or assisting either party with money or otherwise to prosecute or defend it.' " *Wright v. Commercial Union Ins. Co.*, 305 S.E.2d 190, 192 (N.C. App. 1983) (quoting *Smith v. Hartsell*, 63 S.E. 172, 174 (N.C. 1908)). " ' 'Champerty' is a form of maintenance whereby a stranger makes a 'bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense.' " *Id*. (quoting *Smith*, 63 S.E. 174).

"Champerty exists only where the interference is 'for the purpose of stirring up strife and continuing litigation.' " *High Voltage Beverages*, 2010 WL 5924318, at *18 (quoting *Wright*, 305 S.E.2d at 192).[7] The key inquiry into whether the champertor's involvement is " 'for the purpose of stirring up strife and continuing litigation,' " is whether that party "exercised 'control over the claim.' " *Id*. (quoting *Odell v. Legal Bucks, LLC*, 665 S.E.2d 767, 775 (N.C. Ct. App. 2008), *disc. rev. denied*, 676 S.E.2d 905 (N.C. 2009)).

To illustrate, in *Odell v. Legal Bucks, LLC*, a case decided by the North Carolina Court of Appeals, Nancy Odell pursued a personal injury claim stemming from an automobile accident. 665 S.E.2d at 770. She expected to eventually recover $30,000 but fell into financial difficulty

---

[7] The United States District Judge for the Western District of North Carolina fully adopted the Magistrate Judge's recommendations regarding champerty and maintenance. *High Voltage Beverages, LLC v. Coca-Cola Co.*, No. 3:08CV367, 2011 WL 831523, at *6 (W.D.N.C. Mar. 3, 2011) ("Moreover, the magistrate's reliance on *Smith v. Hartsell*, 150 N.C. 71, 63 S.E. 172 (N.C. 1908), *Oliver v. Bynum*, 163 N.C. App. 166, 592 S.E.2d 707 (N.C. Ct. App. 2004) and *Odell v. Legal Bucks, LLC*, 192 N.C. App. 298, 665 S.E.2d 767 (2008) is correct. The key factor in determining whether HVB was 'stirring up strife and continuing litigation' for purposes of champerty is whether HVB exercises 'control over the claim.' ").

before her case was resolved. *Id*. In need of money, Odell approached Legal Bucks, LLC to obtain an advance to help pay for her living expenses. *Id*.

Legal Bucks agreed to advance Odell $3000 in exchange for a security interest in the proceeds of any recovery in her personal injury action. *Id*. at 770-71. The parties agreed that if Odell succeeded in her personal injury action, Legal Bucks was entitled to an amount equal to its advance plus up to 325% interest on the advance. *Id*. The agreement specifically stated that Legal Bucks would have no control in the underlying litigation. *Id*. at 771. Delving into the record on appeal reveals the agreement did not require Odell to consult with Legal Bucks should she obtain replacement counsel; Odell was only required to notify Legal Bucks that she had hired a new attorney. Plaintiff/Appellant's Record on Appeal at 171, ¶ 9, *Odell v. Legal Bucks, LLC*, 665 S.E.2d 767 (N.C. Ct. App. Sept. 7, 2007) (No. COA07-1094).

Once the $3000 advance was made, Legal Bucks sat by mostly passively waiting for a recovery and was not actively involved in the case. *Odell*, 665 S.E.2d at 775. No additional advances were contemplated in the parties' agreement and none were made. *Id*. at 770.

Odell eventually settled her personal injury claim for $18,000. *Id*. at 771. By that time, Odell owed Legal Bucks $9750 from the proceeds. *Id*. Rather than pay Legal Bucks, Odell initiated an action claiming, *inter alia*, that the agreement constituted champerty. *Id*. Legal Bucks successfully moved for summary judgment on that issue, and Odell appealed. *Id*. at 771-72.

At the North Carolina Court of Appeals, Legal Bucks asserted that the agreement itself obviated all notions that it could control the litigation and thus Odell's champerty argument should fail. *Id*. at 774. However, the Court of Appeals refused to apply a rule that "an assignment of litigation proceeds is not *per se* champertous because such an assignment alone

10

does not give the assignee any control over the underlying litigation." *Id*. (discussing *Charlotte-Mecklenburg Hosp. Auth. v. First of Ga. Ins. Co.*, 455 S.E.2d 655, 657 (N.C. 1995)). Instead, the court considered the circumstances surrounding the agreement because "an assignment of proceeds may still be champertous if some other aspect of the contract gives the assignee such control." *Id*.

In weighing whether Legal Bucks had control in the litigation, the court looked to Legal Bucks' lack of interference and influence over the underlying litigation and settlement proceedings as well as Legal Bucks' lack of influence over Odell's decisions on matters such as obtaining replacement counsel. *Id*. at 775. Because Odell failed to show that Legal Bucks influenced or interfered with the litigation, the Court of Appeals concluded that Legal Bucks lacked the requisite level of control to deem the agreement champertous. *Id*.

The parties' relationship in this matter is much different. Legal Bucks advanced funds once and then passively stood by waiting to collect its interest in the claim proceeds. After providing funds, Legal Bucks had no influence or even ability to influence the action. Here, the trustee is required to make regular funding requests upon RDSL as the litigation progresses and seek its input and approval of strategic decisions.

The trustee's argument that RDSL lacks control in these actions fails to recognize RDSL's power of the purse. The trustee would not receive all funds up front to use in her sole discretion. Instead, she must go back to RDSL on a quarterly basis and ask RDSL to open its wallet. In each instance, RDSL is given an opportunity to weigh whether its involvement continues to be a profitable endeavor and whether continued funding is in its, rather than the debtors' creditors', best interest. If not, RDSL may decline to make additional advances. Unlike Legal Bucks, RDSL has repeated opportunities to cut off funding should the litigation begin to

diverge from its initial expectations or if it simply elects to abandon the venture. Absent that funding, the trustee concedes the Insider Actions cannot go forward,[8] empowering RDSL to kill the litigation.

Beyond the ultimate power to cut off funding, the Agreements permit RDSL to control the litigation in a number of other ways. The Agreements require that the trustee obtain RDSL's approval to increase the litigation budget. That decision directly affects how the trustee and the firms prosecute the Insider Actions. Additionally, the Agreements require that the trustee "consult" with RDSL should she wish to change attorneys, which is a far departure from the terms relevant in *Odell* that required only notification once the decision to change attorneys was made.

The provisions requiring the trustee to seek RDSL's permission to increase the litigation budget and to consult with RDSL regarding replacement counsel combined with the power attendant to the funding relationship vests RDSL with significant control over the Insider Actions and constitutes champerty under North Carolina law. Because the Court cannot approve an agreement that violates public policy, the trustee's motion must be denied.

| | |
|---|---|
| *This Order has been signed electronically.*<br>*The Judge's signature and Court's seal*<br>*appear at the top of this Order.* | *United States Bankruptcy Court* |

---

[8] Although the trustee argues that her attorneys are still obliged to continue the litigation, in advocating for this funding, she admits that in its absence neither they nor any other firm are willing and able to do so.